IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LAUREN V., et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COLONIAL SCHOOL DISTRICT | : | NO. 07-308 |

ORDER AND OPINION

JACOB P.  HART                                          DATE:  October 22, 2007
UNITED STATES MAGISTRATE JUDGE

I.      Introduction

        In this case, plaintiffs Lauren V. and her parents, David V. and Karen V., have sued the

Colonial School District ("the District") under the Individuals With Disabilities Education Act,

("IDEA"), 20 U.S.C. § 1400, *et seq*.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A.

§ 794; and under the Civil Rights Act, 42 U.S.C. § 1983, as well as for breach of contract.

        The parties have filed cross-motions for summary judgment on the administrative record.

For the reasons that follow, I will grant the District's Motion for Summary Judgment, and deny

the Plaintiffs' motion.

II.     Legal Standards

A.      Summary Judgment

        Summary judgment is warranted where the pleadings and discovery, as well as any

affidavits, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. Pr. 56.  The moving party has the burden of

demonstrating the absence of any genuine issue of material fact.  Celotex Corp.. v. Catrett, 477

U.S. 317, 323 (1986).  In response, the non-moving party must adduce more than a mere scintilla

of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in

its pleadings.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, supra at 325; Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party.  Anderson v. Liberty Lobby, supra at 255;  Tiggs Corp. v. Dow Corning Corp., 822 F.2d 358 , 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra, at 323.

B.     The IDEA

All states receiving federal education funding under the IDEA must comply with federal requirements designed to provide a "free appropriate public education" ("FAPE") for all disabled children, including special education as well as "related services" such as physical and speech therapies.  20 U.S.C. § 1412(1); Shore Regional High School Board of Education v. P.S., 381 F.3d 194, 198 (3d Cir. 2004).

Such special education and related services must be tailored to the unique needs of the handicapped child by means of an Individualized Education Program ("IEP").  20 U.S.C. § 1414(d); Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 173 (3d Cir. 1988), cert. denied 488 U.S. 1030 (1989).  The IEP consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive.  Polk, supra.  It is usually accompanied by a Notice of Recommended Educational Placement ("NOREP"), setting forth the specific school or other educational placement recommended by the School District.

In order to provide a FAPE, an IEP must be "reasonably calculated" to enable the child to receive "meaningful educational benefits" in light of his or her "intellectual potential." Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley, 458 U.S. 176, 206-07 (1982); Ridgewood Board of Education v. N.E., 172 F.3d 238, 247 (3d Cir. 1999).

The IDEA authorizes judicial review of administrative decisions. 20 U.S.C. § 1415(I)(2). Because this provision permits the reviewing court to hear additional evidence, courts do not use the "substantial evidence" standard usually applied when reviewing administrative decisions, but instead "must decide independently whether the requirements of the IDEA are met." Susan N. v. Wilson School District, 70 F.3d 751, 757 (3d Cir. 1995) quoting Murray v. Montrose County School District, 51 F.3d 921, 927 (10th Cir. 1995).

The United States Supreme Court directs courts to give "due weight" to the factual findings of the hearing officer in an IDEA case. Board of Education of Hendrick Hudson Cent. Sch. District v. Rowley, 458 U.S. 176, 206 (1982). The Third Circuit has interpreted the due weight requirement to mean that courts should exercise a modified *de novo* review of the administrative decision. S.H. v. State-Operated School Dist. of the City of Newark, 336 F.3d 260, 269 (3d Cir. 2003).

Factual findings from the administrative proceedings are to be considered *prima facie* correct, and if the reviewing court fails to adhere to them, it must explain why. Id. at 270. In Pennsylvania, which has a two-tier special education due process hearing system, this deference is owed to the appeals counsel, rather than to the hearing officer, unless it is found that the appeals counsel wrongly ignored the hearing officer's factual findings. Carlisle Area School District v. Scott P., 62 F.3d 520, 529-30 (3d Cir. 1995).

III.   <u>Factual and Procedural Background</u>

A.   <u>Lauren V.'s History And First Contacts With the Colonial School District</u>

Plaintiff Lauren V. was born on March 17, 1988.  Record No. 8 at p. 3.  She has been diagnosed with a number of cognitive and mental disorders, beginning with an ADD diagnosis at the age of four, and also including diagnoses of post-traumatic stress disorder, Tourrette's syndrome, bipolar disorder and a learning disability.  Record No. 11 at Exhibit S-20.  She was first hospitalized in the psychiatric unit of the Horsham Clinic at the age of seven.  <u>Id</u>.

In the summer of 2001, prior to Lauren's eighth grade year, her family moved into the Colonial School District.  <u>Id</u>.  Lauren was assessed as eligible for special services based on her learning disability, and placed in a regular public school with some supports.  <u>Id</u>.  However, after a few months in public school, she was admitted once again to the Horsham Clinic in February, 2002.  <u>Id</u>.  She completed the school year as an inpatient at Foundations Behavioral  Health.  <u>Id</u>. There she was diagnosed with ADHD, oppositional defiance disorder, bipolar disorder and intermittent explosive disorder.  <u>Id</u>.

In August, 2002, the District re-evaluated Lauren, and placed her in September at Wordsworth Academy, a private school.  <u>Id</u>.  That placement ended badly, as a result of what the District evaluator termed "inappropriate sexual conduct" but Lauren's parents describe as a sexual assault.  <u>Id</u>. and Record at 8, at 239.

Between January and March of 2003, the District placed Lauren in an emotional support classroom at the Plymouth Whitemarsh High School.  Record 11, at 2-20, <u>supra</u>.  In March, Lauren's parents placed her in the Three Springs Outdoor Therapeutic Program in Alabama.  <u>Id</u>. Unfortunately, she was discharged from that program in June for failing to make progress.  <u>Id</u>.

The procedural posture of Lauren's relationship with the District at the time she entered the Three Springs program is unclear.  In any event, on June 4, 2003, Lauren's parents and the District entered a settlement agreement.  Record No. 11 at S-4.  Pursuant to this agreement, the District paid Lauren's parents a total of $67,315 for her education between April 1, 2003 and June 5, 2005.  Id.

In return, the parents waived their right to FAPE and waived any claims against the District through June 30, 2005.  Id.  Paragraph 14 of the settlement agreement read, in part: "The parties agree that prior to the end of August 2005, unless otherwise mutually agreed by the parties, the District will conduct a re-evaluation of the Student in accordance with Pennsylvania regulations." Id. at page 7.  (Underlining in original).  Paragraph 15 provided:

> The District and the Parents shall meet as an IEP team to develop an IEP for the 2005-2006 school year within the District.  The IEP team meeting shall occur by the end of August, 2005 ... but no later than August 31, 2005, **unless otherwise mutually agreed by the parties.**

Id.  (Underlining in original, bold supplied).

The last paragraph of the settlement agreement stated:

> This agreement constitutes the entire agreement and understanding between the parties concerning the subject matter to which it expressly or implicitly pertains.  It supersedes and rescinds all prior or contemporary agreements or understandings and **can be modified only in writing executed by the parties**.

Id.  (Emphasis supplied).

Lauren returned to Pennsylvania after her discharge from the Three Springs program and attended New Hope Academy for the 2003-2004 school year.  However, in the spring of 2004, Lauren was asked not to return there.  Record No. 11 at S-6.  In July, 2004, her parents placed her at The Heritage School, a  program located in Provo, Utah.  Id.  In response to an August, 2004,

request from Lauren's parents, the District agreed to provide additional money to cover the extra

cost of residential schooling.  Record No. 11 at S-7.  Lauren was successful at the Heritage

School, but was discharged in July, 2005.

B.      The August 10, 2005, Meeting

        Some of the facts occurring after this point are in dispute, and other agreed-upon facts are

subject to very different interpretations by the parties.  It is agreed that, in the Spring of 2005, the

District obtained progress reports and a discharge summary from the Heritage School.  Record

No. 11 at S-8 through S-10.  However, the District did not perform a re-evaluation.

        It is also agreed that the District did not offer an IEP or a NOREP to Plaintiffs prior to the

start of the 2005-2006 school year, or, indeed at any time during that school year.  Record No. 9

at 39-40 and 72, Testimony of Cassandra DeLong, Director of Pupil Services for the District.

The Plaintiffs met with the District on August 10, 2005, but the parties agree that this was not an

IEP meeting.  Id. at 47.

        Lauren's father testified before the Dispute Resolution Hearing Officer that, in the

summer of 2005, he had a telephone conversation with Dr. Kenneth Sheinen, a psychologist for

the District, about Lauren's return to Philadelphia.  Record No. 8 at 247, Testimony of David V.

He testified that it was he, David V., who requested the August 10, 2005, meeting:

>       In talking to Ken, it was "Well, we're not sure what we're doing.  We're
>       considering Kennedy Kendrick [a local parochial school].  We're not sure what
>       the District has ... We should sit down and talk about the pros and cons of what
>       we're thinking, what the School District can come up with, because in no way" –
>       and I've said this both to him and also at the meeting – "we're not wedded to any
>       one placement." ... So we weren't wedded to anything, and I clearly stated that.

Id. at 250-251.

As to the August 10th meeting, David V. testified:

> We talked about, well, we were thinking about – well, she's coming home – or she had just come home, actually, a week or two before – we need to try to find something for her.  We were considering Kennedy Kendrick, and we went through that reasoning why we were considering that ... .  We did not enroll  her, but we said, well, this is something we'd like to consider.  We gave them $100 as a placement fee, just to say all right, let's hold the placement for her.  And so we sat down and said this is what we're thinking, this is why.  They came back and said, Well, jeez, you ought to be concerned about that.  We're not sure that's the best placement for her."

> So we talked about the pros and the cons of the placement, in terms of how it would fit with Lauren.  At which point in time Karen said, "Well" – and I distinctly remember this – "we agree, we're not wedded to Kennedy Kendrick.  Maybe we should do an evaluation of doing that."  And so they came back and said, "Well, if you're sending her to a private school, we can't do an evaluation." ... So we did talk about with the District, "You know, if you have anything else, please tell us.  If you have any other placements that you can recommend, please talk to us about them."

Id. at 251-253.

David V. testified that the District did mention Lakeside School, and one other possible placement, and that he and his wife had told the District that they would "definitely go out and visit them."  Id. at 254.  He specified that he never told the District that he did not want an evaluation, nor did he tell the District that he did not want an IEP or a "program placement," or NOREP.  Id. at 250.  When asked:  "Did you say at the [August 10th] meeting that you wanted no programming from them?", he replied:  "No, absolutely the opposite."  Id. at 255.

The other participants at the meeting, however, told a different story.  Dr. Sheinen testified that David V. had called him in May or June, 2005:

> And we spoke and he said, Ken, I want to tell you, we're going to enroll Lauren at Kennedy Kendrick.  And I remember being very surprised and said something to the effect – expressed my surprise, do you think that's going to be a thorough enough program?  Yes.  We feel we've tried everything else, something to that

effect ... And in that conversation was, all we want for Lauren is transportation.

Id. at 185, Testimony of Dr. Kenneth Sheinen.

Cassandra DeLong, the District's Director of Pupil Services, said that, at the August 10th meeting, Lauren's parents were "adamant" about sending their daughter to Kennedy Kendrick. Record No. 9, at 42, 47, Testimony of Cassandra DeLong. She conceded that the District did not offer a placement: "However, we discussed placements with the family. ... We discussed Lincoln Academy. We discussed Lakeside. We discussed Community Services Foundation, but the Parents were very adamant about enrolling Lauren at Kennedy Kendrick private parochial high school." Id. at 42.

Ms. DeLong testified:

I don't recall having discussions with the Parents about a re-evaluation per se; however, what I clearly remember is convening the August 10, 2005, meeting. And the reason I convened that meeting was because I knew that the District had an obligation to provide an appropriate program, and I was nervous about the fact that the Parents were pulling Lauren and placing her at Kennedy Kendrick. I did not want the District to be culpable in any way with the Parents saying that we failed to provide an appropriate program. And so, they had to place her at Kennedy Kendrick. I wanted to meet with them and be absolutely certain that this was their desire to do so, and that's why I convened the meeting on August 10, 2005.

And they indicated at that time that that's what they wanted to do going forward, and they didn't feel a need to have a – we didn't specifically discuss a re-evaluation, but it would have been only been a matter of mechanics to do a re-evaluation and an IEP and a NOREP at the time because they didn't want a program from us.

And I know that they have been – you know, the Parents have typically asked the District if they wanted something, and the District has responded to those requests. So, I felt that we had a positive working relationship with the family, and we move forward from that point.

Id. at 96.

Eileen Spector, the District's Supervisor of Special Education was also at the August 10, 2005, meeting.  Like Ms. DeLong, she testified:  "[A]lmost at the start of the meeting Parents said that they were sending Lauren to a parochial school."  Record No. 9 at 126.  Although she did not remember Lauren's parents specifically saying that they did not want an IEP or an evaluation from the District, she did remember that they "reassured" the District personnel that Lauren could be successful at Kennedy Kendrick:

> They talked about Lauren still being in therapy.  They talked about Lauren being on medication ... and tutoring as well to help support Lauren, and they were looking forward to this new start. ... In fact [Lauren's parents] were saying, you know, thank you, you've worked with us, this is what we're going to do now, if it doesn't work we'll be back.

Id. at 132, 160-161.

Ms. Spector further testified that she told the parents they might consider alternative placements "such as Lincoln, Lakeside, and CSF."  Id. at 162.  However, Karen V. responded: "Not at this time, their experience in an approved private school was that the kids were bad and Lauren will hang around with bad kids.  Catholic school, there's structure.  There's uniforms." Id. at 162-163 (Testimony of Eileen Spector).

On August 10, after the meeting, Ms. DeLong wrote a confirming letter addressed to David V. and Karen V.  She wrote:

> Dear Mr. and Mrs. [V.]:
>
> It was a pleasure to meet with you today to discuss your daughter Lauren and her return from the Heritage School in Utah.  We understand your desire to enroll her at Kennedy Kendrick High School, a private parochial school, to optimize the success she achieved at Heritage.
>
> Should you desire at some point in time to have Lauren return to public school the Colonial School District is prepared to provide a program for her.  Upon

9

registration in Colonial School District, we would schedule an evaluation and subsequent IEP meeting, based on her strengths, and needs recommend an appropriate placement.

As we discussed I will ask Ellen Reilly, home school visitor and district liaison for alternative educational programs, to arrange site visits for you for a few programs which may be considered in the future.

Feel free to contact me should you have questions or concerns.  Again, it was most enjoyable to talk today about Lauren's success and I wish you all the very best as she transitions back to Pennsylvania.

Record No. 11 at S-12.

In a letter dated September 2, 2005, David V. responded to Ms. DeLong's letter:

Thank you for the attached letter.  We are hopeful, yet a little pessimistic, that Lauren will be able to perform at the school we have chosen and appreciate your willingness to support her educational needs in the future.  Along those lines we do think she will need tutoring help that Kennedy Kendrick will not be able to provide.  Therefore we would appreciate your assistance in obtaining some after school tutoring services for Lauren to help her keep up.  We also appreciate your offer to have someone from the District review and arrange site visits for some alternative education programs.  We look forward to hearing from them soon.  We would like to keep Lauren at home and in the area, but are also realistic about the limited programs available for kids in Lauren's situation.  Thank you for your efforts on behalf of Lauren.

Id. at S-13.

Cassandra DeYoung testified that she was surprised at the expression of pessimism on the part of the parents, since, on August 10th, "they were very firm in their belief that she would be successful at Kennedy Kendrick."  Record No. 9 at 51-52. Eileen Spector also described being "absolutely shocked at the first sentence" of the letter, because she "didn't hear pessimism at all at the meeting on August 10th."  Record No. 9 at 165.  However, she did arrange at-home tutoring for Lauren.  Id.; and Record No. 8, at 223-224, Testimony of Michelle Young.

10

As to arranging visits to alternative schools, Ellen Reilly, the District's Home and School Visitor, testified, and her notes reflected, that she left a telephone message for Lauren's parents on September 16, 2005.  Record No. 9 at 209, Testimony of Ellen Reilly.  She testified that this call was not returned, and that when she reached David V. in a second call she placed on September 27, 2005:  "he communicated to me that his daughter was attending another program, but that he would speak with his wife and get back to me."  Id.  Lauren's parents did not call Ms. Reilly again.  Id. at 211.  Ms. Reilly called again in November, and gave them information on the Lakeside School.  Id.  She testified that she later gave them information on Lincoln Academy.  Id.  David V. testified that neither he nor his wife visited either of these schools.  Record No. 8 at 304.

C.      Lauren's Transfer To Rancho Valmora

David V. also testified that one reason he did not return Ellen Reilly's phone calls is that his household was in a state of crisis in the autumn of 2005.  Record No. 8 at 261.  Lauren's behavior was deteriorating while she was at Kennedy Kendrick, raising concerns about drinking, drugs, failing to keep her curfew, and neglecting her school work.  Id.  David V. and Karen V. began to work with an educational consultant in October, in an attempt to find Lauren a residential placement.  Id. at 278.  However, when asked whether they called the District to say: "Lauren's in crisis, we want a program placement", David V. responded:  "Did we make a specific phone call?  No."  Id. at 262.

On November 28, 2005, Lauren arrived at her new placement, Rancho Valmora, a residential program located in New Mexico.  Id. at 265.

The only individual from the District who knew that David V. and Karen V. were contemplating sending Lauren to an out-of-state residential program was Michelle Young, Lauren's tutor.  Record No. 8 at 227-228.  She found this out at a parent-teacher conference held at Kennedy Kendrick on or about November 24, 2005.  Id. at 226-227.

David V. explained that he never explored Lakeside School or the Lincoln Academy because, as the autumn went on, he increasingly doubted whether a day program would be sufficient for Lauren.  Record No. 8 at 263.  He testified that he did not call the District to ask about a residential placement because he wasn't confident that the District would come up with an appropriate placement.  Id. at 264.

In later December, the District received a written request for a Due Process hearing, addressed by counsel for Plaintiffs to Dr. Gary Ledebur, the District's Director of Special Education.  Record No. 9 at 85-86.  In it, Plaintiffs sought tuition reimbursement for the Rancho Valmora placement and an Independent Educational Evaluation, as well as an appropriate local residential placement for Lauren.  Record No. 11 at S-1, 1 of 20.

David V. testified that he telephoned Ms. DeLong some time between November 28 and December 22, 2005, to ask for funding from the District for Rancho Valmora.  Id. at 268-269.  Ms. DeLong, however, testified that she first became aware that Lauren was no longer at Kennedy Kendrick when she received a copy of the December 22, 2005, Due Process request.  Testimony of Cassandra DeYoung; Record No. 11 at S-1, page 1.  She said:  "We did detective work to determine where she was and discovered that her Parents had placed her at Rancho Valmora in New Mexico."  Id. at 86.

12

Similarly, Eileen Spector testified that she was "absolutely shocked" when she received the December 22, request for Due Process, because she had no idea that Lauren was not at Kennedy Kendrick.  Id. at 145.  She testified that Karen V. had expressed some doubts about Lauren's success at Kennedy Kendrick, in a telephone conversation early in November.  Id. at 136-137.  David V. had also called in November to inquire about a program called Anderson Alternative.  Id.  However, when neither parent followed up on these conversations, Ms. Spector testified, she left a telephone message on December 1, 2005, asking the parents to call her to arrange a meeting.  Id. at 141, 172.  However, the parents did not call her back.

As a result of the Due Process hearing request, the District began a formal evaluation of Lauren, and finally issued an evaluation report on April 27, 2006.  Record No. 11 at S-20.  After some complications arising from a denial of services by Medical Assistance, Lauren was placed in a local, residential program in late June, 2006.  Record No. 9 at 269-270, Testimony of David V.

D.     The Administrative History of This Matter

1.     The Second Due Process Request

The December 22, 2005, letter did not, ultimately, lead to a Due Process hearing.  Instead, after a number of postponements, the parties notified the Hearing Officer that the matter was settled, and he therefore dismissed the matter on June 9, 2006.  Record No. 11 at S-1, 10 of 20.

Nevertheless, on June 28, 2006, Plaintiffs filed another request for a Due Process hearing. Id. at 11 of 20.  In this request, they sought (a) tuition for Lauren's final month at The Heritage School in July, 2005; (b) compensatory education for the entire 2005-2006 school year, including the term at Kennedy Kendrick and the term at Rancho Valmora, and (c) funding for an Independent Educational Evaluation.  Id.

2.   <u>The Hearing Officer's Decision</u>

After two hearings, which took place in August and September of 2006, the Hearing Officer denied the Plaintiffs relief, in a decision dated October 27, 2006.  Record No 5.   On the issue of tuition reimbursement, the Hearing Officer ruled that the Plaintiffs had not met the test for private school reimbursement set forth in <u>Burlington County School Committee v. Massachusetts Department of Education</u>, 371 U.S 359 (1985).  This requires an initial inquiry as to whether the District's IEP offered an appropriate education; if not, it must be determined whether the parents' unilateral placement in a private school was reasonable.  If the placement was reasonable, the balance of equities is considered.

The Hearing Officer concluded that the Parents had not shown that the final, one-month placement at Heritage School in July 2005, was reasonable, and that the equities disfavored an award of tuition because the Plaintiffs did not notify the District that they were seeking reimbursement before the June 28, 2006, initiation of the due process procedures.  <u>Id</u>.

The Hearing Officer also denied Plaintiffs compensatory education for the 2005-2006 school year.  Although there was no IEP or NOREP offered, the Hearing Officer said "it was also clear" that Lauren attended Kennedy Kendrick as a private placement, "and did not seek to attend the District during the 2005-2006 school year."  <u>Id</u>.  He wrote:  "Districts are not required to develop an IEP for a student when the student is attending a private school."  <u>Id</u>., citing <u>In re: G.R v. Penn Delco</u>, PA SEA 1301 and <u>In re:  M.F. v. William Penn</u>, PA SEA 1372.  He concluded that, even though it appeared that the District violated its settlement agreement by failing to evaluate Lauren, or draw up an IEP, the Plaintiffs were not entitled to compensation.

3.    <u>The Appeals Panel's Decision</u>

Plaintiffs appealed the Hearing Officer's denial of relief.  In an decision dated December 14, 2006, however, the Appeals Panel also denied relief, agreeing with the Hearing Officer in most respects.  Record No. 2.  As to the tuition reimbursement for July at The Heritage School, the Panel found that there was some evidence that the school placement was appropriate, but that the evidence was insufficient because there was no explanation as to why an extra month was necessary, and there was no tuition breakdown to show the actual costs for that month.  <u>Id</u>. at p. 5.  The Panel also wrote:  "[W]e would have to agree with the hearing officer in that the equities would not point in Parents' favor because Parents failed to give the District any  notice beforehand that they were keeping the Student at the private program another month."  <u>Id</u>.

The Appeals Panel also agreed that, although the District did not prepare an IEP or an Evaluation Report, the Parents were not entitled to compensatory education for the 2005-2006 school year for two reasons.  First, "the parents led the District to believe they were not interested in having the Student return to the District for that school year and that is the reason the District failed to test or offer a program."  <u>Id</u>., <u>citing</u> <u>Gregory R. v. The Penn Delco School District</u>, 262 F. supp. 2d 488 (E.D. Pa. 2003).  Secondly, "compensatory education is supposed to replace services the student did not receive ... [it] is not awarded as a remedy if a student is attending a private school; rather, the remedy for non provision of FAPE to a student is tuition reimbursement."  <u>Id</u>.  She concluded:  "Accordingly, Parents will not be awarded compensatory education for the Student's attendance at private programs for school year 2005-2006."  <u>Id</u>.

E.      Plaintiffs' Claims In The Present Case

Plaintiffs have explained in their motion for summary judgment that they are no longer

pursuing claims for compensatory damages under the IDEA, § 504 of the Rehabilitation Act, or

42 U.S.C. § 1983.  However, they continue to seek tuition reimbursement for the July, 2005,

placement at The Heritage School and compensatory education for the 2005-2006 school year,

under the IDEA and the Rehabilitation Act, as well as damages for breach of contract.

They claim that the Appeals Panel erred in affirming the Hearing Officer's "incorrect

legal conclusion that Lauren's parents' pursuit of a private school placement for Lauren in the

face of the District's utter failure to offer Lauren an appropriate placement – or any placement at

all – somehow negated the District's affirmative statutory and contractual duties to provide

Lauren with FAPE."

IV.     Discussion

A.      The IDEA

1.      The July, 2005, Placement at The Heritage School

In their argument pertaining to tuition reimbursement for Lauren's July, 2005, stay at the

Heritage School, Plaintiffs maintain:  "It is abundantly well-settled that where a District fails to

offer an appropriate program to a special education student and where his family has obtained an

appropriate private placement, tuition reimbursement is the remedy."  They maintain that,

because the 2003 Settlement Agreement waived all claims only through June 30, 2005, the

District's obligation to provide FAPE recommenced on July 1, 2005.

Plaintiffs further argue that they should have been found to meet the Burlington test,

because the Appeals Officer was wrong in concluding that they had not shown that the Heritage

16

School was an appropriate placement.  Finally, they argue:  "The Appeals Panel also improperly

ignored Lauren's right to an ER and IEP under the terms of the settlement agreement, which the

District clearly breached.  Thus, the Appeals Panel erred in upholding the Hearing Officer's

decision, and no deference is due to this erroneous legal conclusion."[1]

The District has responded that the Appeals Panel's conclusion was correct and should be

affirmed, because the Plaintiffs did not show all three of the Burlington factors.  They also point

to 34 C.F.R. § 300.148(d)(1)(ii), one of the IDEA's implementing regulations, which provides

that reimbursement for private school tuition can be denied where parents do not provide ten

days notice of the placement.[2]

I agree with the District.  The Appellate Panel conceded that the Plaintiffs had put forth

evidence that The Heritage School was generally an appropriate placement for Lauren.  What

was lacking, however, was any evidence explaining why the extra month, specifically, was

appropriate.  Indeed, there is no evidence in the Record explaining when or why the decision was

made that Lauren would remain at The Heritage School in July, 2005.

---

[1]In their discussion of Lauren's putative entitlement to tuition for her July, 2005, placement at The Heritage School, Plaintiffs also maintain that the Appeals Panel wrongly relied on The Educational Assignment of Jaime D., Special Ed. Op. No. 1120 (2001) in deciding that "Lauren's attendance in private school somehow barred her from seeking compensatory education."  Given that Plaintiffs have sought only tuition reimbursement for the July, 2005, placement, this argument appears to be irrelevant.  The Hearing Officer cited Jaime D. only with respect to the 2005-2006 school year, and not with respect to the Heritage School claim.  Therefore, I will not address this argument.

[2]It is not clear whether 34 C.F.R. § 300.148(d)(1)(ii) applies in this case, since it speaks of circumstances where a child is removed from public school and placed in a private school.  Here, Lauren simply continued in her private school placement for another month.  The Appeals Officer wrote that the regulation did not apply, but that "an analogy could be made nevertheless" in the context of consideration of the equities.  Record No. 2 at 5, n. 7.  There is also some indication that this regulation has been applied more generally where tuition reimbursement for a unilateral placement is at issue.  See, e.g., Roxanne J. v. Nevada Cty. Human Services, No. Civ. S-05-2602 KJM, 2006 WL 3437494  at *4 n. 6 (E.D. Cal. Nov. 28, 2006) (No reimbursement for District's failure to provide Extended School Year services where parents unilaterally placed child at special needs summer camp).

I also agree that the parents' failure to notify the District that Lauren would stay at The Heritage School during July was an equitable factor which the Hearing Officer and the Appeals Panel were entitled to consider.  Not only did the David V. and Karen V. fail to ask the District for extra tuition as soon as they decided that Lauren would be staying for that month, they failed to ask at any point until almost a year after the fact.  Even if this delay did not violate 34 C.F.R. § 300.148(2)(d)(ii), it clearly went against what the Honorable Cynthia M. Rufe of this District has called the IDEA's requirement of "open, cooperative communication between parents and the District." L.S. ex rel. K.S. v. Abington School District, 2007 WL 2851268 at *10 (E.D. Pa. Sep. 28, 2007).

Finally, I cannot accept Plaintiffs' argument that this is a case where "a District failed to offer an appropriate program to a special education student," so that tuition reimbursement is appropriate.  Prior to July, 2005, neither party ever put on the table the issue of whether or where Lauren would be educated that month.  The 2003 Settlement Agreement did not even contemplate the District's provision of an Evaluation Report and IEP, which would precede the offer of a recommended placement, until August 31, 2005.

In accordance with this discussion, I affirm the Appeals Panel's conclusion that the District did not violate the IDEA in refusing to reimburse Plaintiffs for Lauren's tuition at The Heritage School in July, 2005.

2.   The 2005-2006 School Year

Having reviewed the entire administrative record, I find that the evidence strongly supports the Hearing Officer's factual conclusion, accepted by the Appeals Officer, that, at the August 10, 2005 meeting, David V. and Karen V. told the District personnel that Lauren would

be attending Kennedy Kendrick as a private placement.[3]  This was the recollection of every

individual who attended the hearing, aside from David V.

  Not only was this the testimony of Dr. Kenneth Sheinen, Cassandra DeLong, and Eileen

Spector, but it was the thrust of the letter mailed to Lauren's parents by Ms. DeLong, confirming

the events of the August 10th meeting, in which she wrote:  "We understand your desire to enroll

[Lauren] at Kennedy Kendrick High School, a private parochial school ... Should you desire at

some point in time to have Lauren return to public school the Colonial School District is

prepared to provide a program for her."  Record No. 11, supra, at S-12.

  David V.'s reply confirms the accuracy of Ms. DeLong's letter.  Despite his expression of

"a little pessimism" about Lauren's chance of success, David V. called Kennedy Kendrick "the

school we have chosen." Id. at S-13.  He then requested after-school tutoring (which was

promptly provided by the District), and reiterated his interest in arranging "site visits for some

alternative education programs." Id.  He did *not* question Ms. DeLong's assumption that Lauren

would be attending Kennedy Kendrick.  He did not question her failure to schedule an IEP

meeting or an evaluation.  Notably, he did not seek funding for Kennedy Kendrick from the

District.

  Thus, although channels of communication were left open between the District and

Lauren's parents for the exploration of other possible placements, there is no evidence that David

V. and Karen V. subsequently expected or wished for an IEP meeting or an evaluation report,

much less a NOREP (notice of recommended placement).  It is also clear that Lauren's

---

[3]I understand the term "private placement"  to mean a school selected by the parents without engaging the
District in the IDEA process of locating and recommending an appropriate placement.

placement at Kennedy Kendrick was not a result of the District's failure to provide an evaluation report or convoke an IEP meeting.  Instead, the Plaintiffs had decided on Kennedy Kendrick before the August 10th meeting.

Lauren's parents' placement of her at Rancho Valmora was also private; it was an accomplished fact by the time the District became aware that Lauren had left Kennedy Kendrick. Despite Plaintiffs' position on this issue, simply mentioning the possibility of a finding a new school in front of Lauren's two-hour-per-week tutor does not evidence an effort by the Plaintiffs to invoke Lauren's rights under the IDEA.

In denying relief, the Appeals Panel relied on <u>Gregory R. v. Penn Delco School District</u>, 262 F. Supp. 2d 488 (E.D. Pa. 2003).  Although the facts in <u>Gregory R.</u> differ from those in this case, the Honorable J. Curtis Joyner decided there that a District was not required to offer an IEP where it was led to believe that a child was satisfactorily attending a private school selected by his parents.  <u>Id</u>. at 493.

Thus, the result of these private placements is that the District was not required to provide Lauren with an evaluation or an IEP between the time Plaintiffs informed the District that she would attend Kennedy Kendrick and the time that the District became aware that Plaintiffs once again wished the District to provide a placement for Lauren.  This was the import of Cassandra DeLong's letter to David V. and Karen V. after the August 10th meeting, to which David V. did not object:  "Should you desire at some point in time to have Lauren return to public school the Colonial School District is prepared to provide a program for her."

Here, again, it not clear whether the IDEA regulations address Lauren V.'s specific circumstances.  The District points to 34 C.F.R. § 300.137 which provides that a "parentally-

placed private school child with a disability" has no right to FAPE, as opposed to a child placed or referred to a private school by her school district.  The Plaintiffs, however, maintain that § 300.137 pertains only to a child who has never been identified by the District as a special needs student.  They argue that the applicable regulation here is § 300.148, cited in the previous section of this Opinion, which pertains to "a child with a disability, who previously received special education and related services under the authority of a public agency" whose parents enroll her in a private school without the consent of or referral by the public agency.

Because I have no input from the administrative level on this issue, I will base my decision here on Gregory R., rather than upon the regulations.  I note, however, that Plaintiffs would not be entitled to relief under § 300.148, in any event, for two reasons:  (a) Section 300.148 contemplates tuition reimbursement, and not the compensatory education Plaintiffs seek; and (b) if Plaintiffs sought tuition reimbursement for Kennedy Kendrick and Rancho Valmora under § 300.148 they would run into the same equitable problem under Burlington that they did with The Heritage School; Plaintiffs did not provide the District with notice of their actions until they invoked the due process procedures.

Finally, I must re-emphasize the lack of a factual connection between the alleged wrongdoing by the District  and Lauren's enrollment at Kennedy Kendrick and then Rancho Valmora.  The decision to place Lauren at Kennedy Kendrick was clearly made before the time agreed upon for the holding of an IEP meeting, and the production of an evaluation report.  Because David V. and Karen V. explored alternate placements only with an educational consultant, without following up on school visits the District sought to arrange, or ever asking the District for a residential placement, it is also clear that the decision to move Lauren to Rancho Valmora was not the result of the District's failure to propose a placement.

21

I acknowledge the long, complicated and undoubtedly painful process Lauren's parents went through to provide their child with the best education and other assistance they could find. It is also easy to credit David V.'s testimony that he did not ask the District for a residential placement because he had no confidence that it could provide a suitable one, given that Lauren's experiences in public school and at the Wordsworth Academy were so bad. Nevertheless, to access Lauren's rights under the IDEA, Plaintiffs were required to make the District a part of their decision-making process. The regulatory framework does not permit parents to act at will and simply bill the District later. For this reason, I am compelled to conclude that Plaintiffs are not entitled to relief under the IDEA.

B.    <u>Breach of Contract</u>

Under Pennsylvania law, a plaintiff may establish a claim for breach of contract by showing: (1) the existence of a contract; (2) a breach of a duty imposed by the contract; and (3) resultant damages. <u>Ware v. Rodale Press, Inc.</u>, 322 F.3d 218, 255 (3d Cir. 2003), <u>citing</u> <u>CoreStates Bank v. Cutillo</u>, 723 A.2d 1053, 1058 (Pa. Super. 1999); <u>Lackner v. Glosser</u>, 892 A.2d 21 (Pa. Super. 2006).

The 2003 settlement agreement only compelled the District to provide an evaluation report and to hold an IEP meeting by August 31, 2005, "unless otherwise mutually agreed by the parties." Record No. 11 at S-4, ¶ 15. Based on the facts as I have found them, the parties mutually agreed otherwise at the August 10th meeting. The Plaintiffs argue, however, that any attempt to do so was invalid under ¶ 23 of the settlement agreement, because it was not in writing.

22

Even if this is true, however, Plaintiffs are not entitled to damages for breach of contract because they have not shown resultant damages.  As explained above, Plaintiffs have not proved that they incurred the expenses related to Kennedy Kendrick School or Rancho Valmora as a result of the District's failure to hold an IEP meeting or to complete its evaluation of Lauren. They certainly did not incur these expenses as a result of the failure by the parties to put their "mutual agreement otherwise" into writing.

C.      The Rehabilitation Act, § 504

Plaintiffs maintain that the District violated § 504 of the Rehabilitation Act by failing to provide Lauren with a Service Plan.   This section of the Rehabilitation Act provides that "no otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."  29 U.S.C. § 794(a).  In Pennsylvania, § 504 is implemented through the development of a Services Agreement with the school district.  34 C.F.R. § 104.31-35; 22 Pa. Code § 15.7.

Thus, a *prima facie* case of discrimination under § 504 requires proof that (a) the plaintiff is disabled; (b) she is otherwise qualified to participate in school activities; (c) the school or board of education at issue receives federal funding; (4) she was excluded from participation in, denied the benefits of, or subject to discrimination at the school; and (5) the school or board of education knew or should be reasonably expected to know of her disability.  W.B. v. Matulla, 67 F.3d 484, 492 (3d Cir. 1999).

The requirements of the IDEA and § 504 can overlap, but a violation of the IDEA is not a *per se* violation of § 504.  As the District Court for the Western District of Pennsylvania has explained:

> It is true that the Third Circuit has held that "there are few differences, if any, between the IDEA's affirmative duty and § 594's negative prohibition and [has] noted that the regulations implementing § 504 require school districts 'provide a free appropriate education to each qualified handicapped person in [its] jurisdiction.'"  Ridgewood [Bd. of Education v. N.E., 172 F.3d 328 (3d Cir. 1999)] at 253, quoting W.B., 67 F3d at 492-93.  This does not mean, however, that the failure to provide a FAPE is *per se* discrimination under § 504 ... . To the contrary, as the Third Circuit stated later in its opinion, "the failure to provide a free appropriate public education violates IDEA and therefore *could* violate § 594."  Id. (Emphasis added).  Thus, there is no *per se* finding.  To recover under § 504 ... a plaintiff must still meet all of the elements of a *prima facie* case under [the statute].

Indiana Area School District v. J.H., 428 F. Supp. 2d 361, 363-364 (W.D. Pa. 2006).

Here, Plaintiffs cannot show the fourth element of a § 504 case.  Lauren was not excluded from participation in any program or denied the benefits of schooling because of her handicap. Any denial that could be proved was a result of the District's belief that its assistance was not required for the 2005-2006 school year.

Moreover, as the Plaintiffs have conceded, "if a child is identified by a school district under IDEA, and the provisions of that Act are fulfilled, the school district's responsibilities under § 504 are also fulfilled."  Memorandum in Support of Motion at 11; 34 C.F.R. § 104.33(b)(2)  ("Implementation of an Individualized Education Program developed in accordance with the Education of the Handicapped Act is one means of meeting the [FAPE] standard").  Here, I have found that the District met its responsibilities toward Lauren under the IDEA.  Therefore, there can be no finding of a § 504 violation.

24

V.     <u>Conclusion</u>

For the reasons set forth in this Opinion, I now enter the following:

O R D E R

AND NOW, this    22nd    day of October, 2007, upon consideration of Plaintiffs'

Motion for Summary Judgment on the Administrative Record, docketed as Document No. 16,

and the Colonial School District's Motion for Disposition on the Administrative Record And For

Summary Judgment, docketed as Document No. 17, as well as the parties' responses and replies

in these motions, it is hereby ORDERED that

1.  The Colonial School District's Motion is GRANTED; the administrative decision of

Special Education Appeals Panel Opinion No. 1786 is AFFIRMED in its entirety; and

2.  Plaintiffs' Motion for Summary Judgment is DENIED; and it is further ORDERED

that;

3.  Judgment shall be entered in this case in favor of Defendant, the Colonial School

District.


BY THE COURT:


/s/Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE

25